# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche Manning | Sitting Judge if Other than Assigned Judge | Geraldine Soat Brown |
|---|---|---|---|
| **CASE NUMBER** | 02 C 1242 | **DATE** | 6/12/2002 |
| **CASE TITLE** | Relational Funding vs. Advantage Schools | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Report and Recommendation to Hon. Blanche Manning is submitted herewith. For the reasons set out therein, this Court respectfully recommends that the request of plaintiff Relational Funding Corp. for an order of replevin be DENIED. Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed. R. Civ. P. 72(a). Failure to file objections with the District Court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the report and recommendation. Lorentzen v. Anderson Pest Control, 64 F.3d 327, 330 (7th Cir. 1995).

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| X | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | JUN 1 3 2002 | **29** |
| | Notified counsel by telephone. | date docketed | |
| | Docketing to mail notices. | 15 | |
| | Mail AO 450 form. | docketing deputy initials | |
| X | Copy to judge/magistrate judge. | date mailed notice | |
| tw | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials |



| | | |
|---|---|---|
| RELATIONAL FUNDING CORP., **Plaintiff,** | ) ) ) | **Cause No. 02 C 1242** |
| **v.** | ) ) ) | **Judge Blanche M. Manning** **Magistrate Judge Geraldine Soat Brown** |
| **ADVANTAGE SCHOOLS, INC., Defendant.** | ) ) ) | |

To:    The Honorable Blanche M. Manning
        United States District Court Judge

## REPORT AND RECOMMENDATION

Geraldine Soat Brown, United States Magistrate Judge

Plaintiff Relational Funding Corp. ("Relational") brought a two-count complaint against defendant Advantage Schools, Inc. ("Advantage") for breach of contract and replevin.[1] Relational sought a hearing on its request for replevin, which was referred to this Court. [Dkt # 8.][2] For the reasons set out herein, this Court respectfully recommends that Relational's request for an order of replevin be DENIED.

---

[1]  As discussed below, Advantage Schools, Inc., changed its name in August, 2001 to Mosaica Advantage, Inc. For simplicity, it is referred to herein as "Advantage."

[2]  An order of replevin is a dispositive order. *Harris Graphics Corp. v. F.C.L. Graphics, Inc.,* 84 C 5814, 1985 WL 5111, (N.D. Ill. December 27, 1985)(Kocoras, J.). Pursuant to 28 U.S.C. §636(b)(1)(B), this ruling is a report and recommendation, rather than an order.



## JURISDICTION

Relational asserts that there is diversity jurisdiction pursuant to 28 U.S.C. § 1332.[3] Relational is an Illinois corporation with its principal place of business in Illinois and Advantage is a Delaware corporation with its principal place of business in New York. (V. Compl. ¶ 1 [Dkt # 1]; V. Answer ¶ 2 [Dkt # 12].)  The matter in controversy exceeds $75,000.

## PROCEDURAL BACKGROUND

Following the filing of Relational's Verified Complaint and Advantage's Verified Answer, an evidentiary hearing on Relational's request for replevin was held over four days.  Four witnesses testified and numerous exhibits were admitted.  Post-hearing briefs and supplemental arguments were submitted on behalf of both parties. [Dkt ## 22-23, 25-26.]  Evidence submitted at the hearing showed the following.

## EVIDENCE PRESENTED AT THE HEARING

The Master Lease and Equipment Schedules.

Relational provides lease financing of computer and other equipment.  (V. Answer ¶1.) Advantage is in the business of operating and managing charter schools. (Pl.'s Ex. 30.)  Relational leased to Advantage certain furniture, computers and learning materials such as textbooks (collectively referred to as the "Equipment") specified in a Master Lease and twenty-three Equipment Schedules. (V. Answer ¶ 5; R. 118.)[4] Relational was aware that the Equipment was going to be used

---

[3] See discussion below about additional necessary parties whose presence might destroy diversity.

[4] "R.___" refers to the pages of the consecutively numbered transcripts of the evidentiary hearing.

in various charter schools being managed by Advantage. (R. 86.) The Master Lease (Pl.'s Ex. 1) was signed September 7, 1999.[5] (R. 11.) Each of the twenty-three Equipment Schedules includes an Exhibit A that lists the location to which the Equipment was shipped, a list of the amounts paid by Relational to the vendor for the equipment at each of the locations in the schedule, a base rent, and a base term (usually 36 months). (Pl.'s Exs. 2-24; R. 13-14.) Each Equipment Schedule has a Certificate of Acceptance identifying the "location of the items of Equipment" and the Date of Acceptance. Each Equipment Schedule also includes an Appendix A listing the "casualty value percentage" for each of the 36 months of the term. The casualty value schedule states the amount the lessee would pay for any destroyed or lost equipment. (R. 40.) For example, if sixteen months of payments had been made, the lessee would pay an amount equal to the original equipment cost multiplied by the percentage assigned to month 16 of the lease. (R. 40.)[6] Equipment Schedule No. 1 is dated October 6, 1999 (Pl.'s Ex. 2); Equipment Schedule No. 23 is dated November 20, 2000

---

[5] Advantage argues that the Master Lease also includes a sample Equipment Schedule that was designated Exhibit 1A. (R. 12.) Relational denies that the sample Equipment Schedule constitutes part of the agreement between the parties. (R. 13.) For reasons set out herein, it is unnecessary to this recommendation to resolve that dispute.

[6] The parties dispute two aspects of the lease terms. The Equipment Schedules state that the base term date is the first day of the calendar *quarter* following the commencement date. Advantage contends that the proper term should be the first day of the calendar *month* following the commencement date as in the sample schedule (Ex. 1A). (V. Answer, Additional Defenses ¶ 8.) Also, Relational interprets the commencement date as the date of acceptance on the Certificate of Acceptance, which reflects the acceptance of all of the Equipment, while Advantage interprets the commencement date as the date of the acceptance of the first unit. (R. 446.) Because the base lease term is 36 months after the base term date, the parties thus have different views of when the lease obligations on each Equipment Schedule began, what month of the term each of the Equipment Schedules is in, and when the lease ends. (Prior to the base term date, Advantage paid interim prorata rent based on the monthly charges. (Master Lease § 3; R. 66, 83-84.)) However, as discussed below, this decision on Relational's request for replevin does not require resolution of these issues.

3

(Pl.'s Ex. 24). After certain amendments are considered, the total base rent due each month for all of the Equipment Schedules is $155,881.70. (R. 159.) The total amount listed on the Equipment Schedules as the value paid by Relational to the vendor is approximately $4.8 million. (R. 34.) Relational's Remarketing Department estimates that the current resale value of the Equipment is $1.5 million. (R. 35.)

The Events of Default claimed by Relational.

In March 2000, a fire occurred at the Rocky Mount school in North Carolina, resulting in a loss of some of the Equipment listed in Equipment Schedules 1, 2, 4, and 7. (R. 48.) Based on the casualty value schedules, Relational estimated that the value of the destroyed equipment was approximately $76,000 and demanded that Advantage pay that amount. (R. 50.) Interpreting the Lease terms differently (*see* footnote 6), Advantage calculated the destroyed Equipment at $67,000 and did not pay any amount. (R. 51.) Relational asserts that, under the Master Lease, Advantage had thirty days to pay, and that Advantage's failure to pay is an event of default under the Master Lease. (R. 52.) After March 2001, Relational continued to receive base rent that was not reduced because of the Equipment loss at the Rocky Mount school. (R. 104.)

In June 2001, Advantage was a week late in paying the rents due. (R. 52.) Advantage made no payments of rent in July or August 2001. (R. 52.) On August 10, 2001, Daniel Flagstad, Relational's senior vice president (R. 151) sent a letter to Advantage setting out the amounts that were then due and owing as $422,556.95, including the July and August 2001 rent and the Rocky Mount casualty loss. (Def.'s Ex. 6; R. 278-79.)

On August 24, 2001, Advantage Acquisition, Inc. was merged into Advantage Schools, Inc.

and the surviving corporation (Advantage Schools, Inc.) changed its name to Mosaica Advantage Inc. (Pl.'s Ex. 30, Certificate of Merger.)

On August 27, 2001, John Polster, Relational's associate general counsel (R. 10), sent two letters to Advantage, declaring default, acceleration of all amounts under the Lease, and termination of the lessee's interests. (Pl.'s Exs. 26-27.) One letter declared a default because the merger on August 24, 2001 had been without Relational's express written consent, and stated that '[s]uch a default by its nature cannot be cured. . . ." (Pl.'s Ex. 26.) The second letter declared a default for failure to pay rent in the amount of $422, 000. (Pl.'s Ex. 27.) In both of those letters, Mr. Polster stated, "Relational Funding Corporation hereby reserves all rights and remedies under the Lease, at law or in equity, waiving none, and will accept further payment or return of equipment only upon this express condition." (Pl.'s Exs. 26-27.)

Testimony about the events.

Relational called Mr. Flagstad and Mr. Polster as witnesses. Mr. Polster testified that Relational first learned in July 2001, that there might be a buyout of Advantage. (R. 52-53.) At that time, Relational's Collection Department called Advantage and was told that Advantage was undergoing a buyout. (R. 97.) Advantage sent a letter to that effect to suppliers and creditors in late August 2001. (R. 98.) (The letter was not put into evidence.) Mr. Polster testified that Relational did not know what impact that transaction had on the financial capacity of Advantage. (R. 100.)

Mr. Flagstad testified that he knew before August 24, 2001 that Jay Simner and David O'Keefe of Relational were having conversations with Stephen Todd, an outside consultant for Advantage, that included a possible corporate transaction for Advantage. (R. 243-44.) Mr. Simner,

a vice president of Relational, reported to Mr. Flagstad that Mr. Todd had informed him that certain warrants (comparable to stock options) given by Advantage to Relational would be worthless under the transaction. (R. 206, 213.) Mr. Simner made that report "some time right around the merger date." (R. 213.) Mr. Flagstad did not know if the report occurred before August 24th by a day or two, or on August 24th or August 27th. (*Id.*) Mr. Flagstad testified that he and John Morand of Relational had authority to consent to events such as the merger of a lessee, that Mr. Morand had no involvement, and that he (Mr. Flagstad) did not consent orally or in writing to the transaction. (R. 214.)[7] However, he testified that it is a regular part of Mr. Simner's job to interact with lessees and report back to Mr. Flagstad. (R. 207.)

Mr. Flagstad was involved in the decision to declare the defaults. He testified that Relational declared the defaults because it was unable to get any information regarding the proposed buy out until after it occurred. (R. 176-77, 201-02.) The issue, he said, comes down to the financial circumstances and character of the lessee. (R. 204.) Mr. Flagstad testified that Relational was looking for credit information regarding the new obligor under the Lease. He testified that Relational was not provided with that information. (R. 179-80.)

> We had not received any information regarding this merger. And we had not received any lease payments. And we didn't feel like we were being treated fairly by Advantage Schools, and we were tired of it.

(R.181.) Mr. Flagstad testified that at the end of August, 2001, following the transaction, Mr. Flagstad made a request for financial information from Thomas Luplow, an attorney for Advantage. (R. 244.) Mr. Flagstad testified that he did not get the financial information that he sought from Mr.

---

[7] Relational had previously agreed to a merger that changed Advantage Schools from a Massachusetts corporation to a Delaware corporation, and a formal amendment of the Master Lease was executed to reflect approval of that change. (Pl.'s Ex. 1; R. 166.)

Luplow. (R. 245.) He received some information after the merger, but it did not include all of the information he asked for. Furthermore, the first financial statement he received reflected an eight-figure misstatement of shareholders' equity in the company. (R. 302.) He was not provided with a pro-forma closing balance sheet prior to the transaction.

In December 1999, Advantage had caused a letter of credit in the amount of $1 million to be issued by Silicon Valley Bank in favor of Relational. (Pl.'s Ex. 25.) Mr. Flagstad testified that Relational had sought the letter of credit as additional collateral for the Lease, to improve Relational's position. (R. 192-93.) The Master Lease and Equipment Schedules do not refer to a letter of credit or discuss the application of any proceeds. (R. 239-40.) On August 27, 2001, Relational drew on the letter of credit and received the $1 million on September 7, 2001. (Pl.'s Ex. 29; R. 48.)

Advantage called Mr. Todd and Thomas Luplow as witnesses. Mr. Todd is an employee of Argus Management Company, a firm that performs consulting for distressed corporations. Argus was retained by Advantage in the summer of 2001, and Mr. Todd was the Argus employee who performed the consulting for Advantage. (R. 311-12.) Mr. Todd testified that in the summer of 2001 Advantage was in a severely distressed cash flow situation. (R. 312.) In late June or early July, Mr. Todd called Mr. Simner in Relational's Credit Department and Mr. O'Keefe, Relational's business relationship manager. Mr. Todd told them that Advantage had barely enough to make the payroll, that no payment would be made in July, and that he (Mr. Todd) was trying to get Advantage through the crisis. (R. 312-14.) He told them that the situation was dire, that Advantage would seek bankruptcy protection, most likely Chapter 7, unless a strategic transaction came along. (R. 315.) Subsequent to that conversation, in mid-July 2001, Mr. Todd learned that Mosaica Education was

interested in a transaction of some sort with Advantage, and he passed that information on first to Mr. O'Keefe, and then at Mr. O'Keefe's suggestion, to Mr. Simner. (R. 316-18.) When Mr. Simner again asked for the July rent payment, Mr. Todd told him that until there was a cash infusion, Advantage would not have the funds to pay Relational. (R. 319.)

Mr. Todd had several subsequent conversations with Mr. Simner, informing him that there was an identified party and an identified amount of cash that would be coming into the company. Mr. Todd told Mr. Simner and Mr. O'Keefe that Advantage's payments to Relational would be brought current within a week after the transaction closed. (R. 330.) Toward the end of July, Mr. Todd identified the interested party as Mosaica Education. Mr. Simner asked for certain financial information about Mosaica, specifically, the most recent balance sheet and the profit and loss statement, and general background information. Mr. Todd testified that Mr. Simner received the information that he asked for. (R. 320-22.) In mid-August, Mr. Todd and Mr. Simner again spoke. Mr. Todd testified that Mr. Simner acknowledged that he had received the information and told Mr. Todd that it looked okay, and that he would review the information and talk within a few days. Mr. Simner did not say that anyone else at Relational needed to review the information; according to Mr. Todd, "Mr. Simner indicated that he was the right person to speak to." (R. 324.)

Shortly thereafter, in the second or third week of August, Mr. Todd and Mr. Simner spoke again. Mr. Simner stated that the historical information about Mosaica Education was adequate, but he requested pro forma information about the combined entities. Mr. Todd told him that he would ask the Mosaica personnel to pull that information together, but that it would take some time and not be done before the transaction closed. (R. 325-26.)

The week prior to the transaction, Mr. Simner and Mr. Todd spoke again. Mr. Todd told Mr.

. . .     . '

Simner that the transaction would result in an infusion of $7.5 million into Advantage. (R. 333.)
Mr. Simner told Mr. Todd that he would approve of the transaction and provide the necessary
consents for the transaction. At Mr. Simner's direction, Mr. Todd called Mr. O'Keefe on or about
August 22, and explained the transaction to him, including the additional money that would be
coming into the deal. Neither Mr. Simner nor Mr. O'Keefe told Mr. Todd that he needed to talk to
anyone else at Relational. (R. 335.) Mr. Todd told Mr. Simner and Mr. O'Keefe that the warrants
(essentially an option to purchase common stock) were worthless because the only persons who
would receive anything in the transaction would be the preferred stock holders; the common stock
was worthless. (R. 339, 342-43.)

Mr. Todd testified that he sought a written consent to the transaction from Relational, and
sent consent forms to Relational the week prior to the transaction. (R. 358.) He called Mr. Simner
on August 22 or 23, 2001, and told him that the transaction would be closing that week. (R. 363.)
Mr. Simner told him, "[I]t's not a problem, they'll be on the way, they'll be on the fax tomorrow."
(R. 359.) Mr. Todd again spoke with Mr. Simner on August 23, and told him that the transaction
was closing the next day. (R. 363.) Mr. Simner again said the consents were coming. (R. 360.) Mr.
Todd did not call Mr. Simner on Friday, August 24, the day of the transaction. (R. 360.) He never
received the consents back. (R. 359.) Mr. Todd described the transaction to Mr. Simner and Mr.
O'Keefe as a sale of assets, which is how he understood it was to be structured. (R. 327, 357.) On
the day of the transaction it changed to the merger form. (R. 357.)

On Monday, August 27, 2001, Mr. Todd called Mr. Simner wondering why the consents that
were to be faxed had not been received. Mr. Simner said it was out of his hands, and directed Mr.
Todd for the first time to Mr. Flagstad. Mr. Flagstad was angry, and told Mr. Todd that he had not

received any information about the transaction. (R. 336.)

Thomas Luplow is a Michigan lawyer who represents Mosaica Advantage, Inc. (R. 364.) He testified that on the date of the transaction, the name of Advantage Schools, Inc. was changed to Mosaica Advantage, Inc., but it is the same entity. (R. 365.) The sole shareholder of Mosaica Advantage, Inc. is Mosaica Holdings, Inc. (R. 369.) Some of the former shareholders of Advantage received shares of Mosaica Holdings, Inc. as a result of the transaction. (R. 370.) As part of the transaction, Advantage Schools, Inc. merged with another entity, Advantage Acquisition, Inc. (R. 406.)

Mr. Luplow further testified that, after receiving the August 27, 2001 default letters, he called Mr. Flagstad on August 29, 2001, and asked him what would be necessary to have the lease reinstated in light of those letters. Mr. Flagstad told him that it was necessary to have past due rents made current. Mr. Luplow was also interested in having the draw down on the letter of credit reversed, since Advantage (now Mosaica Advantage) intended to bring the rents current. Mr. Flagstad said he would look into it. Mr. Flagstad also wanted additional information concerning the combined entity.

Mr. Flagstad followed up with an e-mail on August 29, 2001 (Pl.'s Ex. 34) identifying eight items of specific information needed, and stating that Relational had proceeded "past the point of no return" regarding the letter of credit. Mr. Flagstad also stated, "As far as attempting to negotiate the possibility of keeping all or a portion of the existing debt in place, RFC [Relational] would consider that discussion only upon receipt of the past due payments under the leases." (Pl.'s Ex. 34.) Mr. Luplow responded by e-mail on August 30, 2001:

We are prepared to send a wire transfer to cure the existing default. Please call me

asap today to discuss reinstating the lease.
The information you requested will be sent to you by overnight mail for delivery no later than next Thursday. We can send you items 27 [2-7] of your request tomorrow if you would prefer.

(Pl.'s Ex. 34.) Mr. Flagstad responded with an e-mail stating:

I will call you this afternoon to discuss this current situation. However, the payment alone will not cure the default of the lease. The payment is a precondition to even discussing RFC's willingness to reinstate the lease.

(Pl.'s Ex. 34.) Mr. Luplow's responding e-mail stated: "I understand and didn't mean to suggest otherwise. I look forward to hearing from you today."

Subsequently, Mr. Flagstad called Mr. Luplow. Mr. Luplow testified that he asked whether, assuming that Advantage paid the past due rents and provided satisfactory financial information, the leases could be reinstated. According to Mr. Luplow, Mr. Flagstad told him, "[A]s far as he knew, there wasn't any reason why they wouldn't be reinstated." (R. 379.) Later that day, Mr. Flagstad called back with the amount to be wire-transferred, which was slightly in excess of $500,000. (R. 380.) On August 30, 2001, Mosaica Education, Inc. directed that a transfer of $500,881.87 be made to Relational's account. (Def.'s Ex. 3.)[8] Mr. Luplow testified that he sent this amount because Mr. Flagstad had told him that it was the amount needed to cure the existing monetary defaults absent the acceleration. (R. 414.) Subsequently, according to Mr. Luplow, Advantage sent the financial information that Mr. Flagstad had requested. (R. 385-86.)

On September 10, 2001, Mr. Flagstad sent an e-mail to Mr. Luplow stating that he had not forgotten about Mosaica [Advantage], that he was having Relational's credit people review the information, and that he would get back to Mr. Luplow on Monday [September 17, 2001]. (Def.'s

---

[8] Mr. Luplow described Mosaica Education, Inc. as the "parent once removed" of Mosaica Advantage, Inc., with Mosaica Holdings, Inc. between. (R. 382.)

Ex. 7.) Mr. Luplow testified that when Mr. Flagstad did not contact him, Mr. Luplow e-mailed Mr. Flagstad on September 25, 2001: "Please call me ASAP. The next monthly payment is rapidly approaching. We need to reconcile the application of the letter of credit in the next day or two." (Def.'s Ex. 7; R. 387.) The reference to the letter of credit referred to their previous discussion about the possibility that certain leases would be bought out and the monthly payment reduced. (R. 388.) A series of e-mails followed between Mr. Luplow and Mr. Flagstad, dealing primarily with the possible application of the letter of credit. (Def.'s Ex. 7.) Mr. Flagstad did not state in any of those e-mails that either the amount wired to Relational or the information provided was insufficient. Mr. Luplow testified that at no time prior to the testimony at these hearings had Mr. Flagstad stated that the information that he received was inadequate. (R. 400.) Mr. Flagstad admitted that after Relational received the $500,881 payment, Mr. Flagstad did not tell Mr. Luplow that the amount was insufficient to commence negotiations, or that it was the incorrect amount. (R. 282-83.) It is Relational's position that the payment did not cure the existing default. (R. 186.)

On December 6, 2001, Relational demanded immediate return of all of the Equipment. (R. 62.) Advantage has not returned the Equipment. (R. 62.) Relational asserts that it has the right to accelerate the base rents due pursuant to the Master Lease, and that there is now due from Advantage $3,620,173, exclusive of late charges. (Pl.'s Ex. 32.) That amount does not reflect a deduction for the $1 million draw down of the letter of credit.

The default provisions of the Master Lease.

The Master Lease, Section 12, "Default and Remedies" states in relevant part:

The occurrence of any one of the following events ("Event of Default") shall constitute a default under any Lease: (A) Lessee fails to pay Base Rent or Additional

12

Rent on or before five (5) days after the date upon which said amounts are due . . . (C) Lessee fails to observe or perform any term, condition, obligation, agreement or covenant set forth in the Master Lease or any Lease and such failure continues for a period of thirty (30) days after written notice thereof is given to Lessee. . . (E) Lessee or any guarantor of Lessee's obligations to Lessor ("Guarantor") ceases doing business as a going concern or merges with, or a substantial portion of Lessee's assets are acquired by, any other entity. . . . Upon the occurrence of an Event of Default, Lessor may at its option, do any or all of the following: (a) without notice to Lessee, declare immediately due and payable by Lessee, as liquidated damages for loss of a bargain and not as a penalty, an amount equal to the amount set forth in the Casualty Value Schedule as of the due date of the last Base Rent received by Lessor, which amount, together with all accrued and unpaid payments of Base Rent, Additional Rent and any other sums due and payable for all periods up to and including the date on which Lessor receives the total of such amount, shall be immediately payable by Lessee; (b) at Lessor's option and with notice to Lessee terminate the Lease in default; (c) regardless of whether the Lease in default is terminated, take possession of any or all Units or render them unusable and, for this purpose, enter upon any premises where any Unit is located without notice, court order or other process of law and without any liability to Lessee or any other party for any damage, loss, cause of action or claim; (d) regardless of whether the Lease in default is terminated, require Lessee to deliver any or all Units to Lessor in accordance with Section 6 hereof; (e) sell, dispose of, hold, use or re-lease any Unit as Lessor in its sole discretion may determine (without giving preference to any sale, re-lease or other disposition of any Unit or similar equipment owned or leased by Lessor) by public or private disposition; (f) proceed by appropriate court actions at law or in equity to enforce performance by Lessee of the terms and conditions of the Lease or to recover damages from Lessee for any breach thereof.

In the event Lessor has received the liquidated damages set forth in the preceding subparagraph, upon any sale, re-lease or other disposition of any Unit, Lessor shall apply to all of Lessee's obligations to reduce Lessee's outstanding obligations under the defaulted Lease: (x) in the case of a sale, the proceeds of the sale; . . .

To the extent permitted by applicable law, Lessee hereby waive any and all rights and remedies conferred upon a lessee by Sections 2A-401 and 2A-402, and Sections 2A-508 through 2A-522 of the Illinois Uniform Commercial Code . . . . To the extent permitted by applicable law, Lessee further waives any rights now or hereafter conferred by statute or otherwise which may require Lessor to sell, lease or otherwise use any Equipment in mitigation of Lessor's damages hereunder or which may otherwise limit or modify any of Lessor's rights or remedies hereunder.

<u>The relevant sections of the Illinois replevin statute.</u>

Relational is not seeking to exercise any rights of self-help repossession set out in the Master

Lease. Rather, Relational seeks an order of replevin under the Illinois replevin statute, 735 Ill.

Comp. Stat. 5/19-101 *et seq.*, which provides in relevant part:

> Section 5/19-101. When brought. Whenever any goods or chattels have been
> wrongfully distrained, or otherwise wrongfully taken or are wrongfully detained, an
> action of replevin may be brought for the recovery of such goods or chattels, by the
> owner or person entitled to their possession.
>
> Section 5/19-104. Complaint. An action of replevin shall be commenced by the
> filing of a verified complaint which describes the property to be replevied and states
> that the plaintiff in such action is the owner of the property so described, or that he
> or she is then lawfully entitled to the possession thereof, and that the property is
> wrongfully detained by the defendant. . . .
>
> Section 5/19-107. Hearing for entry of order. At the hearing on the entry of an order
> for replevin, . . .the court shall review the basis of the plaintiff's claim to possession.
> *If the plaintiff establishes a prima facie case to a superior right to possession of the
> disputed property, and if the plaintiff also demonstrates to the court the probability
> that the plaintiff will ultimately prevail on the underlying claim to possession,* the
> court shall so find as a matter of record and an order for replevin shall be entered by
> the court.
>
> 5/19-109. Order. The order for replevin shall require the sheriff, or other officer to
> whom it is directed to take the property, describing it as in the complaint, *from the
> possession of the defendant*, and deliver the same to the plaintiff unless such
> defendant executes a bond and security as hereinafter provided, and to summon the
> defendant to answer the complaint or otherwise appear in the action, or in the case
> the property or any part thereof is not found and delivered to the sheriff or other
> officer, to answer to the plaintiff for the value of the same. . . .
>
> 5/19-112. Replevin bond. Before the service of the order for replevin the plaintiff
> or someone else on his or her behalf shall give to the sheriff or other officer a bond
> with sufficient security in double the value of the property about to be replevied,
> conditioned that he or she will prosecute such action to effect and without delay and
> make return of the property to the defendant if return of the property shall be awarded
> or will deliver the same to the intervening petitioner should it be found that the
> property belongs to him or her, and save and keep harmless such sheriff or other
> officer as the case may be, in replevying such property and further conditioned for

14

the payment of all costs and damages occasioned by wrongfully obtaining out the
order for replevin, . . . .

(Emphasis added.)

## DISCUSSION

As suggested by the evidence at the evidentiary hearing, Relational asserts that Advantage

has committed events of default under the Master Lease, that Advantage has no right to cure its

defaults, and that Relational has properly terminated the Master Lease, and accelerated the rents due,

and is entitled to take possession of the Equipment. Advantage argues, *inter alia*, that the transaction

on August 24, 2001 was not a material breach of the Master Lease, that Relational is estopped to

assert that the transaction is an event of default and to terminate the Master Lease, and that

Advantage has cured any default that occurred from the non-payment of rent by the payment of in

excess of $500,000 in August 2001 and the application of the $1 million from the letter of credit.

Although the parties vigorously contest these issues, the only issue before this Court is

whether Relational's request for an order of replevin should be granted. Relational sought a hearing

on its request for replevin as soon as possible and this Court accommodated the parties. However,

there are certain fundamental elements of a right to replevin that Relational has failed to address,

which require that Relational's request for replevin be denied.

Relational has failed to join as parties the persons in possession of the Equipment to be replevied.

Under the replevin statute, Relational has the burden of establishing "a prima facie case to

a superior right to possession" as well as "the probability that the plaintiff will ultimately prevail on

the underlying claim to possession." 735 Ill. Comp. Stat. 5/19-107. Relational has not established

15

a fundamental element of its case: It has not demonstrated that the goods it seeks to replevy are in the possession of the only defendant in this case, Advantage.[9] Thus, it is unnecessary to decide whether Relational has established the probability that it will ultimately prevail on the underlying claim, and this Court makes no ruling on that issue.

As discussed above, Relational was aware that the Equipment was to be used by various charter schools managed by Advantage around the country. The Equipment was shipped to various charter schools around the country, as reflected in the Equipment Schedules. No evidence except the Equipment Schedules was presented at the hearing to establish the location of any of the Equipment.

It is well-established that an order of replevin can only be entered against the person who has possession of the goods. Over one hundred years ago the Illinois Appellate Court stated, "[R]eplevin does not lie against one not in possession." *Bishop v. American Preservers Co.*, 41 N.E.765, 775 (Ill. 1895). That principle was carried into the statutory codification of the common law right of action. In *Milhahn v. Sapp*, 86 N.E.2d 667 (Ill. App.1949), an action under the Illinois replevin statute, the court stated:

> Where the defendant has in good faith parted with the possession of the property, the mere fact that he once had had possession thereof is not sufficient to ground the action of replevin. Nor does replevin lie against one not in possession at the time the action is brought.
> Replevin lies only against a person from those [sic] possession the sheriff can take the property and to whose possession it can be returned.

---

[9] During the evidentiary hearing, this Court observed that this case presents an unusual situation for a replevin action because this case involves millions of dollars worth of equipment located around the country which is being used by people who are not parties to the lawsuit. The parties were asked to address those issues in their post-hearing briefs. (R. 258.) The parties' briefs did not address those issues.

*Id.* at 669, citations omitted. *See also Frank v. Hayes*, 166 N.E.2d 283 (Ill. App. 1960), in which the plaintiff seeking return of money that was in the custody of the court named as defendants not only James Hayes, the person who allegedly stole the money, but also Harry Butt, the County Clerk. After the trial court ordered replevin, Hayes appealed, and Butt did not join the appeal. The Appellate Court stated that "the only person who could complain as to the right of the plaintiff to immediate possession would be the person in possession of the money, namely the defendant Harry R. Butt. . . ." *Id.* at 288.

In *Huber Pontiac, Inc. v. Wells*, 375 N.E.2d 149 (Ill. App. 1978), an action for replevin of an automobile, the court held that a defendant who had sold the automobile and no longer had possession was properly dismissed; replevin, a possessory action, could not lie against him. *Id.* at 153. Furthermore, summary judgment for the buyer who took possession without notice of the plaintiff's lien was affirmed. *Id.* at 155. *Cf. S. T. Enterprises, Inc. v. Brunswick Corp.*, 315 N.E.2d 1, 8 (Ill.1974)(buyer who acquires interest in the property after the filing of the lawsuit for replevin and with knowledge of the lawsuit and the claim for replevin is bound by the replevin judgment).[10]

Furthermore, if replevin is justified, the proper order is an order to the sheriff to take the property from the defendant unless the defendant delivers a bond pursuant to the statute. The court cannot substitute an order to the defendant to surrender the property. *Universal Credit Co. v. Antonsen*, 29 N.E.2d 96, 100 (Ill. 1940). *Accord Jim's Furniture Mart, Inc. v. Harris*, 356 N.E.2d 175, 176 (Ill. App. 1976).

---

[10] *Merrill Lynch v. Gray Supply Co.*, Nos. 91 C 1449 and 91 C 1554, 1991 WL 83832 (N.D. Ill. May 8, 1991)(Conlon, J.), cited the *Frank* case for the rule that "a defendant in a replevin action must possess the property sought by the plaintiffs." 1991 WL 83832, *2. *Merrill Lynch* involved an action for replevin of property located in Arkansas and Texas, but there was no dispute that the property was in the possession of the defendant.

Those cases demonstrating that the person in possession of the property must be a party to the replevin action comport with the common sense proposition that the person in possession of the property has an obvious interest in maintaining that possession and should have an opportunity to assert that interest before an order issues directing the sheriff to seize the property. As far as the evidence in the hearing demonstrated, the persons in possession of some, if not all, of the Equipment sought to be replevied are the charter schools. Relational presented no basis on which the Court could distinguish specific Equipment that might be in the possession of Advantage from that which is in the possession of the charter schools. Under Illinois law, a charter school is:

> a public, nonsectarian, nonreligious, non-home based and non-profit school. A charter school shall be organized and operated as a nonprofit corporation or other discrete, legal, nonprofit entity authorized under the laws of the State of Illinois.

105 Ill. Comp. Stat. 5/27A-5. Thus, it appears that charter schools have the ability to sue and be sued as independent entities.

The Equipment Schedules reflect delivery to one charter school in Illinois, the Octavio Paz Charter School located in Chicago. (Pl.'s Ex. 2.) Advantage's Post-Hearing Memorandum states that Advantage no longer manages that school. (Def.'s Post-Hearing Mem. at 2 [Dkt # 22].) However, there was no evidence presented at the hearing concerning the status of the Equipment previously delivered to Octavio Paz Charter School, and that Equipment is part of the property which Relational seeks this Court to order the sheriff to seize. *See* Verified Complaint ¶ 5, defining "Equipment" as the equipment and features, etc., described in the 23 Equipment Schedules, and prayer for relief in Verified Complaint, Count I for replevin, seeking a order of replevin for possession of the Equipment. Thus, Octavio Paz Charter School should have been made a defendant to Relational's action for possession. As demonstrated by the *Huber Pontiac* and *Brunswick* cases

discussed above, there may be factual issues that might prevent the application of a replevin remedy to Octavio Paz Charter School, as well as to each of the other charter schools in possession of the Equipment.

However, the prospect of joining Octavio Paz Charter School or any of the other charter schools who are in possession of the Equipment raises issues under Fed. R. Civ. P. 19. That Rule, which governs joinder of persons necessary for a just adjudication, provides, in relevant part:

> (a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. . . .

> (b) Determination by Court Whenever Joinder not Feasible. If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. . . .

If, as seems likely, Octavio Paz Charter School is a citizen of Illinois, joining that school as a defendant would destroy diversity, since Relational is a citizen of Illinois. 28 U.S.C. § 1332(c)(1). Similarly, there is a question of whether the other charter schools are subject to service of process in this action.

The evidence at the hearing did not provide a sufficient basis to make a determination as to whether joinder of the charter schools is feasible, or if joinder is not feasible, whether the criteria of Rule 19(b) require dismissal. *See Moore v. Ashland Oil, Inc.*, 901 F.2d 1445 (7th Cir. 1990).

Throughout the hearing and in its Post-Hearing Brief, Relational played down the question of the effect that an order of replevin would have on those who are actually in possession of the Equipment, the teachers and students of the charter schools, and avoided such important details as the precise current location and description of the specific property to be seized, arguing instead that Advantage could retain possession by posting a bond in an amount double the value of the Equipment and complying with certain other conditions. (Relational's Post-Hearing Mem. at 13-14.) However, Relational's approach is not adequate. If an order of replevin is entered, the defendant has the *option* of posting a bond to retain the property; the defendant is not required to do so. 735 Ill. Comp. Stat. 5/19-116. Furthermore, in determining whether to recommend the issuance of a replevin order, this Court must assume that Relational genuinely desires the order that it asks the Court to issue, *i.e.*, the possession of the Equipment, and the Court must determine Relational's right to that specific order. As discussed above, the Illinois courts have declined to allow the process of replevin (an order to the sheriff to seize the property) to be short-circuited by issuing an order directing the defendant to produce the property. Similarly, this Court cannot ignore the fundamental requirements of the replevin action by focusing on the defendant's right to post a bond to retain the property.

## CONCLUSION

For the foregoing reasons, this Court respectfully recommends that the request of plaintiff Relational Funding Corp. for an order of replevin be DENIED.

Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed. R. Civ. P. 72(a). Failure to file

objections with the District Court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the report and recommendation. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

ENTER:

Geraldine Soat Brown
United States Magistrate Judge

**Dated: June 12, 2002**